**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA

Plaintiff,

v.                                                  CRIMINAL NO.: 21-245 (FAB)

[8] Cristian Rodriguez,

Defendant.

**REPORT & RECOMMENDATION**

## I.    PROCEDURAL BACKGROUND

Pending before the court is a motion to suppress by Cristian Rodríguez García ("Defendant"). ECF No. 108. On July 14, 2021, a grand jury returned an indictment against Defendant charging him with conspiracy to possess with intent to distribute a controlled substance while aboard a vessel subject to the jurisdiction of the United States, possession with intent to distribute a controlled substance while aboard a vessel subject to U.S. jurisdiction, and with jettisoning property subject to forfeiture from a vessel subject to U.S. jurisdiction all in violation of 46 U.S.C. §§ 70503(a)(1)–(a)(2), 70506(b), and 18 U.S.C. § 2. ECF No. 83 at 1–4. Defendant seeks to suppress the statements he made to law enforcement agents on June 28, 2021. ECF No. 108 at 20. In his motion to suppress, Defendant argues that his statement was made in violation of his Fifth Amendment right to remain silent and his Sixth Amendment right to counsel and was additionally made in violation of his right to prompt "presentment" before a court for an initial appearance hearing. ECF No. 108 at 20, 23. The United States of America ("the Government") subsequently filed a response in opposition to Defendant's motion to suppress. ECF No. 126.

Defendant's motion, which was filed on November 5, 2021, included both a request to dismiss the charges in the indictment, as well as to suppress the statements he allegedly made on June 28, 2021. ECF No. 108. The Government filed its response to the motion to dismiss on December 6, 2021. ECF Nos. 121. However, the Government's response to the motion to suppress evidence was filed on December 13, 2021. ECF No. 126. On December 14, 2021, an order was entered scheduling the suppression hearing to be held on December 23, 2021. ECF No. 129. On December 15, 2022, the United States filed a "supplemental response" to the motion to suppress. ECF No. 136. Five days later, the Defendant filed a "Motion Submitting Factual Basis" in support of his motion to suppress and a "Motion Supplementing Motion to Suppress." ECF Nos. 145; 148. On December 20, 2021, the United States requested a continuance of the suppression hearing. ECF No. 150. Said motion was granted and the suppression hearing was reset for January 13, 2022. ECF No. 155. However, due to the fact that the Metropolitan Detention Center was in a lockdown due to ongoing COVID-19 pandemic, the suppression hearing was reset for February 11, 2022. ECF No. 162.

On February 7, 2022, the United States requested another continuance of the suppression hearing because the Defendant's second motion to dismiss at ECF No. 166 supplementing the original motion to dismiss pursuant a decision of the Court of Appeals for the First Circuit issued in *United States v. Dávila Reyes*, 23 F.4th 153 (1st Cir. 2022) (January 20, 2022) "will more-likely-than-not be fully dispositive of this case, making any motion to suppress moot." ECF No. 200. In light of these circumstances, the suppression hearing was rescheduled for, and in fact was held on, March 7, 2022. ECF Nos. 201; 214.

At this hearing, Defendant reiterated that "the motion [to suppress] continues to be limited to the statement that he made on June 28, 2021." ECF No. 223 at 3. During the

evidentiary hearing, Drug Enforcement Administration ("DEA") Special Agent Lorena Jiménez ("Agent Jiménez") testified for the Government. Defendant also took the stand to testify during the hearing. The parties were granted until two weeks after the transcript of the suppression hearing was produced to file post-hearing briefs. ECF No. 214. The transcript was produced on March 22, 2022. ECF No. 223.

On March 31, 2022, however, the United States filed a motion informing, *inter alia*, that the Government had filed on March 18, 2022 a petition seeking a rehearing *en banc* in the *Dávila Reyes* case and arguing that "because the ends of justice may require it, the Court should hold the case in abeyance until the Court of Appeals in *Dávila Reyes* issues its mandate." ECF No. 224 at 3. On April 6, 2022, the Court noted said motion and entered the following order: "This case is held in abeyance of the mandate in *U.S. v. Dávila Reyes (en banc).*" ECF No. 227. On July 14, 2022, however, the Court vacated its order staying the case and six days later denied the Defendant's motion to dismiss. ECF Nos. 237 and 238. On July 30, 2022, the Defendant filed a Notice of Interlocutory Appeal of the Court's "denial of the motion to dismiss on grounds of lack of extraterritorial jurisdiction." ECF No. 239. The rehearing *en banc* before the Court of Appeal for the First Circuit in *Dávila Reyes* case has been set for October 18, 2022. *United States v. Dávila-Reyes,* 38 F.4th 288 (1st Cir. 2022).

## II.    FACTUAL BACKGROUND

On June 20, 2021, Defendant, a 33-year-old Venezuelan national, was a cook aboard a fishing vessel named "Mi Liny" which was apprehended; the crew was held aboard a Dutch ship 130 nautical miles southwest of Isla de Aves, Venezuela.[1] ECF No. 223 at 11; 69–70; 72; 76.

---

[1] Agent Jiménez testified that on June 20, 2021, members of the U.S. Coast Guard spotted a fishing boat which was towing a "go fast" vessel and identified it as a "target of interest." ECF No. 223 at 25. She stated that U.S. Coast Guard personnel witnessed individuals on the fishing boat jettison what Agent Jiménez described as "bales of narcotics" into the ocean. ECF No. 223 at 26. Agent Jiménez testified that the U.S. Coast Guard boarded the fishing

After being detained, Defendant and the other crew members of Mi Liny remained on the Dutch ship for two days. ECF No. 223 at 70. While aboard the Dutch vessel, Defendant was confined to and slept in the cabin where the ship's helicopter was kept. ECF No. 223 at 70. Defendant was not allowed to move freely on the ship, was shackled on one foot, was not allowed to return to Mi Liny, and was unable to see Mi Liny or anything else outside of the area where he was being held. ECF No. 223 at 71. No evidence was introduced at the suppression hearing that while aboard the Dutch vessel Defendant was addressed by any American authorities. ECF No. 223 at 72.

After two days aboard the Dutch vessel, Defendant was transferred to a United States Coast Guard ship on June 22, 2021. ECF No. 223 at 70, 72. Defendant identified the vessel as a U.S. Coast Guard ship because it was flying the American flag. ECF No. 223 at 73. After being transferred, Defendant was held on this first U.S. Coast Guard vessel for a total of five days. ECF No. 223 at 73. According to the Defendant, "[w]e were going back and forth, back and forth" and after four days on the ship, the U.S. Coast Guard vessel sank the Mi Liny. ECF No. 223 at 73. During the five days aboard the U.S. Coast Guard vessel, Defendant's feet were shackled and he and the other detainees slept underneath a tent on the deck of the ship. ECF No. 223 at 73. Defendant was unable to sleep very much on this U.S. Coast Guard ship because there were no beds in the tent, and if it rained those who were kept inside the tent got wet. ECF No. 223 at 73, 82–83. Nonetheless, Defendant was clothed and given food while aboard the U.S. Coast Guard vessel. ECF No. 223 at 82–83.

---

vessel, recovered the bales, and detained the passengers on board. ECF No. 223 at 26. However, it is unclear where or how Agent Jiménez obtained knowledge of the above facts. The Defendant, on the other hand, testified that he was first detained aboard a Dutch vessel. ECF No. 223 at 72. Whether members of the U.S. Coast Guard were on the Dutch vessel was not clarified by the evidence presented at the suppression hearing.

At 3:00 PM on June 27, 2021, Defendant was transferred from the first U.S. Coast Guard ship to a second U.S. Coast Guard vessel which was to bring the detainees to Puerto Rico the following day. ECF No. 223 at 73–74. Defendant arrived very tired in San Juan, Puerto Rico at 7:45 AM on June 28, 2021, aboard this second U.S. Coast Guard vessel. ECF No. 223 at 11–12; 74; 83. At no time while aboard any U.S. Coast Guard vessel did anyone interview the Defendant except for requesting his biographical information. ECF No. 223 at 12–13, 15. Upon his arrival to Puerto Rico, the DEA took custody of Defendant and 17 other detainees at La Puntilla U.S. Coast Guard Base in Old San Juan. ECF No. 223 at 21.

At the suppression hearing, Agent Jiménez explained that in a typical scenario persons detained by the U.S. Coast Guard who are brought to Puerto Rico are first taken for immigration processing at Customs and Border Protection ("CBP") before they are interviewed by the DEA. ECF No. 223 at 22–23. Immigration processing for a detainee can take anywhere from one to six hours. ECF No. 223 at 24. After immigration processing, detainees are then normally taken to the DEA San Juan Office where the agents collect the detainees' biographical information and conduct post-arrest interviews. ECF No. 223 at 24. After questioning, the DEA usually then feeds the detainees and prepares and submits paperwork for a detainee's initial appearance before the court. ECF No. 223 at 24–25. In 2021 the initial appearances were largely being conducted through virtual videoconferences due to the COVID-19 pandemic. ECF No. 223 at 25.

However, in this case, because there was such a large number of persons—a total of 18 detainees—the arrestees were split into two groups. ECF No. 223 at 27. One group of nine detainees was taken directly to the CBP for immigration processing. ECF No. 223 at 27–28. The other group was taken to the Hiram Bithorn Stadium to be questioned by the DEA while they awaited their turn to undergo immigration processing by CBP. ECF No. 223 at 27–28. Agent

Jiménez accompanied the second group of detainees to the Hiram Bithorn Stadium, arriving sometime between 8:00 AM and 9:00 AM. ECF No. 223 at 27–28. The DEA had spaced tables down the hallway of the stadium where two agents could interview each detainee. ECF No. 223 at 28–29.

Between 9:00 AM and 9:20 AM, the Defendant was interviewed by DEA agents. ECF No. 223 at 14. Agent Jiménez was assigned to interview Defendant at the Hiram Bithorn Stadium. ECF No. 223 at 28–29. She was accompanied in interviewing Defendant by Task Force Sergeant Carlos Burgos ("TFO Burgos"). ECF No. 223 at 32. After the interview was complete, Defendant was given food purchased by the DEA. ECF No. 223 at 36–37. After eating, the detainees at the Hiram Bithorn Stadium were sent to the CBP for immigration processing. ECF No. 223 at 37. Upon being processed by the CBP, the DEA then prepared the corresponding documents for the detainees' initial appearance in court. ECF No. 223 at 37. Defendant made an initial appearance via videoconference before the magistrate judge on duty at 5:38 PM on June 28, 2021.[2] ECF No. 7; ECF No. 223 at 17. The hearing concluded at 5:50 PM. ECF No. 7.

## III.  ANALYSIS

### A. Defendant's Waiver of *Miranda* Rights

Defendant asserts that he unambiguously invoked his right to remain silent which should have ended the interrogation carried out by Agent Jiménez and TFO Burgos. ECF No. 228 at 8–10. Moreover, even had he not invoked his rights, Defendant contends any waiver was not done knowingly or voluntarily. ECF No. 228 at 8–11.

---

[2] Although the parties stipulated that Defendant's initial appearance was held at 6:00 PM on June 28, 2021, the Court's docket reflects that Defendant's initial appearance began at 5:38 PM and concluded at 5:50 PM on June 28, 2021. ECF No. 7.

For statements which a criminal suspect made to police under custodial interrogation to be admissible at trial, law enforcement must have advised the accused of his right to counsel and his right to remain silent using proper *Miranda* warnings. *Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010) (citing *Miranda v. Arizona*, 384 U.S. 436, 471 (1966)); *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). However, when *Miranda* warnings are provided to a suspect who is not represented by counsel, the suspect's statements are admissible provided that the Government can show by a preponderance of the evidence that the defendant made a valid waiver of his rights either explicitly or implicitly. *Berghuis*, 560 U.S. at 382, 384, 386 ("If Thompkins wanted to remain silent, he could have said nothing in response to Helgert's questions, or he could have unambiguously invoked his *Miranda* rights and ended the interrogation."). If a defendant makes a "simple, unambiguous statement[]" during questioning such as that "he wanted to remain silent or that he did not want to talk with the police", he has invoked his "right to cut off questioning." *Berghuis*, 560 U.S. at 382 (internal quotations omitted). The inquiry of whether a waiver is valid "is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *Butler*, 441 U.S. at 373. The validity of a waiver is examined under "the totality of the circumstances." *United States v. Rojas Tapia*, 446 F.3d 1, 4 (1st Cir. 2006). To "knowingly" waive *Miranda* rights means to do so with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon." *United States v. Carpentino*, 948 F.3d 10, 26 (1st Cir. 2020) (citing *United States v. Sweeney*, 887 F.3d 529, 535–36 (1st Cir. 2018)).

### 1. Whether Defendant Invoked His Rights or Knowingly Waived Them

Defendant argues that on June 28, 2021 he invoked his right to remain silent, but that the "agents pressed on with the interview." ECF No. 228 at 8. Furthermore, Defendant argues that he is not a sophisticated man, but rather a cook on a fishing boat who is a "sailor by trade, with a modest knowledge of the sea". ECF No. 228 at 12–13. Accordingly, Defendant concludes that it "cannot be presumed that he may fully understand the notion that even while arrested and under the custody of law enforcement officials, he may still remain silent and refuse to answer questions and to be accompanied by an attorney, free of charge." ECF No. 228 at 12–13. In addition, Defendant alleges that "it cannot be lightly inferred that the defendant would have been able to understand his rights and the consequences of waiting these rights by simply reciting them from a waiver." ECF NO. 228 at 13. Whether Defendant understood and invoked his rights can only be resolved through a credibility determination because Defendant and Agent Jiménez offered divergent versions with regard to some aspects of Defendant's interview at the Hiram Bithorn Stadium.

### a. Agent Jiménez's Testimony

Agent Jiménez first testified that she arrived at the Hiram Bithorn Stadium between 8:30 AM and 9:00 AM on June 28, 2021. ECF No. 223 at 27–28. However, on cross examination she stated that she arrived between 8:00 AM and 8:30 AM to the stadium. ECF No. 223 at 39. Regardless of her exact time of arrival, Agent Jiménez stated that she began speaking to Defendant at 8:30 AM, first advising him of his *Miranda* rights and then collecting Defendant's biographical information. ECF No. 223 at 29, 34, 36. According to her she was accompanied in interviewing Defendant by TFO Burgos. ECF No. 223 at 32. Agent Jiménez described Defendant as "lucid" and "alert" during the interview and that he was wearing the same clothes in which he

had been detained. ECF No. 223 at 35, 38. She also stated that she "personally asked if he was feeling fine and then was able to answer questions and he agreed, and he replied in the affirmative." ECF No. 223 at 35. Agent Jiménez explained that she did not pause the interview, that she did not leave the area during the interview, and that she, TFO Burgos, and Defendant were together the entire time until the interview was concluded. ECF No. 223 at 44, 55.

Agent Jiménez's testimony is consistent with the document admitted into evidence as 'Exhibit 4" and titled "Advice of Rights," wherein Agent Jiménez wrote 8:30 AM in the bottom left corner as the time the advisal was completed. ECF Nos. 212-6; 215-4. The "Advice of Rights" form which Agent Jiménez presented to Defendant informs the reader that "You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during the questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish." ECF No. 212-6; 215-4. Agent Jiménez also testified on direct and cross examination that she read Defendant all of the rights and asked him if he understood what the "Advice of Rights" form was saying and if he had any questions. ECF No. 212 at 33, 47–48. Defendant did not ask any questions and affirmed that he understood his rights, both orally and in writing by providing his initials next to each sentence and signing the document. ECF No. 212 at 33, 47–48. The "Advice of Rights" form also asks a detainee "Do you understand your rights?" and "Are you willing to answer some questions?" ECF No. 212-6; 215-4. Agent Jiménez stated that Defendant verbally agreed to both questions and agreed to be interviewed. ECF No. 223 at 38. Agent Jiménez also testified that Defendant filled out two other forms, including a "Consent to Search" form for Defendant's Samsung cellphone, marked in the

record as "Exhibit 2" and a "Recording Declination" form wherein Defendant indicated that he did not want to be recorded. ECF No. 223 at 31, 43; ECF Nos. 212-2, 212-4, 215-2, 215-3.

Consistent with Agent Jiménez's version of events which states that TFO Burgos was with her during the entire interview, TFO Burgos' signature also appears as a witness on all three forms presented to Defendant. ECF Nos. 212-2, 212-4, 212-6; 215-2, 215-3, 215-4. After advising Defendant of his rights and completing the above forms, both Agent Jiménez and Defendant testified that she then collected Defendant's biographical information, including his age, nationality, residence, employment, and whether Defendant was married and if he had children. ECF No. 223 at 36, 42 Once the DEA agents had collected Defendant's biographical information, from 9:00 AM to 9:20 AM Agent Jiménez and TFO Burgos interviewed Defendant about the incident leading to his detention. ECF No. 223 at 35. TFO Burgos also asked questions to Defendant during the interview. ECF No. 223 at 54–55. Agent Jiménez's notes of the interview convey that Defendant worked as a "chef" on a fishing boat since January 2021 and expressed that the crew had found abandoned "bales" floating "about 140 miles" from Venezuela and that "they all decided to collect the bales." ECF No. 215-1. The notes also indicate that Defendant said the crew was then interdicted by law enforcement and that Defendant "[h]as no knowledge of who's [sic] bales are these" but that "he knew there was contraband/drugs[.]" ECF No. 215-1.

### b. Defendant's Testimony

Defendant testified that when he began speaking to Agent Jiménez, she told him "[t]o remain silent; that there was going to be an interview and the thing about the attorney and stuff." When he was explained his rights, Defendant testified that he did not understand them because he had never been "incarcerated" before. ECF No. 223 at 74–75. Even so, Defendant

acknowledged on cross examination that the DEA agents told him that he had a right to remain silent and should remain silent, and that he could consult an attorney and that he had a right to have an attorney during the interview. ECF No. 223 at 77–78. Defendant also admitted on cross examination that he agreed to be interviewed by the agents. ECF No. 223 at 77–78.

Defendant was only questioned after having signed the three forms presented to him by the DEA agents. ECF No. 223 at 81. He stated that his name is Cristian Rodríguez and that his initials are CR, as appears on the "Advice of Rights" form. ECF No. 223 at 77. He also readily agreed on cross examination that the agents spoke Spanish to him and questioned him in Spanish, which is his native tongue. ECF No. 223 at 76–77. On cross examination, the Government showed Defendant the "Advice of Rights" form and asked him the following questions:

> Q: . . . Would you agree with me that this form is in the Spanish language?
> A: Yes.
> Q: This is what was read to you by the agents and signed by you, correct?
> A: Yes.
> Q: Are those your initials C.R.?
> A: Yes.
> Q: Sir, and is it correct that as part of that form you were also indicated [sic] that you were voluntarily and freely answering the questions of the agents?
> A: Yes.
> Q: That you were not requesting an attorney at that time.
> A: Yes.

ECF No. 223 at 78–79. Defendant nevertheless maintained that rather than agreeing to answer some questions after being given his advisal of rights, he told Agent Jiménez that he was not going to give a statement and told her "I don't want to talk[.]" [3] ECF No. 223 at 75, 84.

---

[3] Defendant also stated that he signed the "Recording Declination" before he told Agent Jiménez that he did not want to make a statement, but that he signed the "Consent to Search" form for his cell phone after he told Agent Jiménez that he did not want to talk. ECF No. 223 at 84–85. The time of the "Recording Declination" form, however, is 8:35 AM, thus placing it after the "Advice of Rights" form was executed. ECF Nos. 212-4; 212-6, 215-2, 215-4.

Defendant described that when he told Agent Jiménez that he did not want to talk, she got up from the table and returned with another agent who told Defendant that "I should talk because otherwise I was not going to see my kids anymore, that I was going to get thirty years in prison . . . that I wasn't going to see my kids anymore and on and on." ECF No. 223 at 75. Defendant testified that after he was "threatened" in this way, he made a statement during which Agent Jiménez took notes in English. ECF No. 223 at 75, 82. In response to Agent Jiménez's questions, Defendant said that he was a cook on Mi Liny, that Mi Liny had departed Venezuela on June 18, 2021, and that the crew had found abandoned bales floating in the sea. ECF No. 223 at 81. Defendant disclaimed, however, having told the agents that the crew of Mi Liny decided to collect the bales into the boat because he said "I didn't know about that. I was in the kitchen." ECF No. 223 at 82.

### c.  Analysis & Credibility Determinations

Agent Jiménez's testimony was generally credible during the evidentiary hearing, although she at times gave evasive answers to Defense counsel on cross-examination and struggled to remember certain secondary details such as at which CBP office the detainees were processed or how the Defendant was clothed during the interview, among others. ECF No. 223 at 45, 55–56. Her testimony was overall internally consistent, however, in that she explained that she and TFO Burgos were both present for the entire interview, that Defendant signed the "Advice of Rights" form, and then both verbally and in writing agreed to waive his rights before giving a statement without her leaving the table and fetching any other law enforcement officers. In addition, the documentary evidence is consistent with her testimony in terms of the time the statements were made.

Defendant's testimony was also generally credible during the hearing. He answered questions quickly, simply, and was not hostile or evasive on cross examination. However, key parts of his testimony which are central to the determination of his waiver of rights were inconsistent and difficult to believe. Specifically, Defendant's testimony indicates that Agent Jiménez gave him the waiver of rights form and that he refused to talk after having signed the form, at which time she then went for another law enforcement officer, presumably TFO Burgos, who pressured Defendant into talking. However, the documentary evidence bears the signature of TFO Burgos as a "witness" to Defendant's signature and initialing of the forms beginning at 8:30 AM, which is a strong indication that TFO Burgos was present at least at the beginning of the interview and that Agent Jiménez did not leave the table to get him during the course of the interview as Defendant's version of events implies.

Additionally, Defendant's assertion that he did not understand his rights is not supported by the weight of the evidence. ECF No. 223 at 74–75. When law enforcement agents read the suspect his rights, confirm that the suspect understood the rights, the suspect signs a waiver form, and the suspect agrees to talk to police, that conduct provides strong evidence of "a complete understanding of those rights." *Carpentino*, 948 F.3d at 26. While it may be true that, as a Venezuelan citizen, Defendant may be generally unfamiliar with the United States justice system, based on his testimony and the exhibits introduced at the hearing there is no convincing reason to think that Defendant did not understand the written or verbal warnings and explanations given by Agent Jiménez. No evidence was presented at the hearing showing Defendant's level of education or his ability to read. However, both Agent Jiménez and Defendant's testimony agreed that he was read the "Advice of Rights" form in his native tongue and that he signed and initialed it. Defendant also agreed that the form he was read indicated

13

both that he was "voluntarily and freely answering the questions of the agents" and that he "was not requesting an attorney at that time." ECF No. 223 at 78–79. Defendant did not testify that he told Agent Jiménez that he did not understand his rights or that he asked clarifying questions about his rights. Therefore, the evidence indicates that Defendant did indeed understand his rights despite his lack of familiarity with the American legal system.

Finally, Defendant's assertion that he suddenly changed his mind and invoked his rights verbally immediately after having waived his rights in writing is not credible. Although Defendant is at liberty to change his mind and invoke his rights at any time, and is not required to give any explanation for changing his decision to talk to the agents, he provided no context for such an abrupt 180 degree turn. One possibility is that Defendant was asked a particular question that prompted him to request immediate cessation of the interview, but no such testimony was given. Another possibility would be that Defendant invoked his right to remain silent immediately after signing the waiver of *Miranda* rights form, but that would raise questions as to why he signed the form in the first place if from the very beginning he had no intention to talk to the agents. If the explanation for why Defendant signed the form is because he was not "aware of his right not to address his captors during the interview," that does not explain why he then allegedly proceeded to address the agents to make a clear invocation of a right which he states he did not understand. Here, a more credible sequence of events is that Defendant was read his rights, understood them, and waived his rights verbally and in writing, but now he regrets having done so when faced with criminal prosecution. Therefore, the weight of the written and testimonial evidence leads to the conclusion that Defendant understood his rights, knowingly waived them, and never told Agent Jiménez that he did not want to talk to the agents.

## 2.  Whether Defendant's Waiver was Voluntary

Turning to whether Defendant's waiver of his rights and subsequent statement was voluntary, "[a] waiver is made voluntarily if the waiver is 'the product of a free and deliberate choice rather than intimidation, coercion and deception.'" *Carpentino*, 948 F.3d at 26 (citing *Sweeney*, 887 F.3d at 536). The proper inquiry for assessing whether a confession is voluntary is "whether the will of the defendant had been overborne so that the statement was not his free and voluntary act." *Bryant v. Vose*, 785 F.2d 364, 367–68 (1st Cir. 1986) (citing *Procunier v. Atchley*, 300 U.S. 446, 453 (1971)). "[A] defendant asserting that a waiver was involuntary on this or any other basis must show some form of coercive law enforcement conduct or overreaching." *Carpentino*, 948 F.3d at 28. Specifically, under the totality of the circumstances, law enforcement officers must have either caused or took advantage of a Defendant's condition in such a way as to coerce the waiver of rights. *Id.* ("Given the totality of the circumstances, the defendant has not shown that the troopers either caused or took advantage of his hunger or exhaustion in a way that rendered his waiver involuntary."). Coercion is evaluated under the totality of the circumstances considering "both the nature of the police activity and the defendant's situation." *United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011). "Relevant considerations may include the length and nature of the questioning, any promises or threats made, and any deprivation of essentials (e.g., food, water, sleep, bathroom facilities) imposed upon the suspect." *Id*. Beyond the actions of law enforcement, a court must also consider the defendant's "age, education, intelligence, and mental condition," and his "prior experience with the criminal justice system." *United States v. Hufstetler*, 782 F.3d 19, 25 (1st Cir. 2015) (citing *United States v. Jacques*, 744 F.3d 804, 809 (1st Cir. 2014)).

Turning to the case at bar, the evidence shows that Defendant's treatment under the totality of the circumstances was not coercive. Defendant admitted that he was fed while aboard the Coast Guard vessels and that he was clothed. No evidence was introduced that Defendant was deprived of water or that he was not allowed to use the restroom while detained aboard any vessel. Likewise, no evidence was introduced concerning Defendant's education, intelligence, or literacy, but it is undisputed that at the time he was arrested the Defendant was a 33-year-old adult who appeared "lucid" and "alert" during his questioning by the DEA agents. ECF No. 223 at 35, 38.[4] Furthermore, the questioning by Defendant, and all documents presented and read to him were given in the Spanish language, which Defendant admits is his mother tongue.

Additionally, the DEA's interview of Defendant was not inordinately lengthy. Agent Jiménez explained that she began the interview with the advisal of rights and collection of Defendant's biographical at 8:30 AM before she began questioning him regarding the alleged criminal conduct at 9:00 AM. ECF No. 223 at 29, 34. By 9:20 AM, the parties agree that Defendant's interview with the DEA agents had concluded. ECF No. 223 at 14. Therefore, Defendant's total interaction involving his waiver of rights, biographical information, and interview spanned 50 minutes and the actual interview regarding the events leading to the charges in this case was only 20 minutes long. Hence, it cannot be said that Defendant's interrogation was unreasonably lengthy or that its length was used to induce a confession.

On the other hand, Defendant's assertion that he was tired upon arriving to San Juan on June 28, 2021 is reasonable, understandable, and credible. The evidence shows that when Defendant was placed on board the first Coast Guard vessel upon which he spent roughly five

---

[4] The mere fact that a defendant is a cook on a fishing vessel is not sufficient to conclude that he is uneducated or illiterate. In view that no evidence was introduced regarding Defendant's education or ability to read and write (aside from his ability to sign and initial documents), no finding can be made for or against the voluntariness of Defendant's statement using these factors.

16

days, he was kept inside a tent on the deck of the ship. In that tent, Defendant stated that he did

not sleep well because he was shackled and when it rained the Defendant got wet from the rain.

As such, Defendant was likely physically exhausted by the time he arrived in San Juan due to

lack of sleep caused by the conditions on the first Coast Guard vessel upon which he traveled.

Defendant, however, provided no evidence that this arrangement was made intentionally to

deprive Defendant of sleep to induce some involuntary statement from Defendant. Indeed, he

was not questioned by members of the Coast Guard with regards to the crimes charged.

Furthermore, Defendant did subsequently spend at least one night on another Coast Guard vessel

which brought him to port on June 28, 2022, but no evidence was introduced as to the sleeping

arrangements on that ship.

    Defendant also testified that he had never been "incarcerated" before. Given Defendant's

status as a foreign national and the fact that no evidence of prior encounters with the law was

introduced into evidence, there is no reason to discredit Defendant's contention that he had no

experience with the American criminal justice system. ECF No. 223 at 74–75. In sum, when

Defendant was questioned by DEA agents, he was tired and a neophyte with regard to the

criminal justice system, but he was also an adult communicating in his own language without

any indications of impaired intelligence or mental illness, not otherwise intentionally deprived of

any necessities preceding the interview by the DEA or during the relatively short interview.

    At the hearing, Defendant testified that TFO Burgos told him "I should talk because

otherwise I was not going to see my kids anymore, that I was going to get thirty years in

prison . . . that I wasn't going to see my kids anymore and on and on." ECF No. 223 at 75. As

explained above, if Defendant never invoked his right to remain silent, it is not apparent why in

Defendant's version of events TFO Burgos would have told Defendant that he should talk if he

wanted to see his children again and avoid a lengthy period of imprisonment. ECF No. 223 at 75. Due to the aforementioned credibility issues with Defendant's testimony, it is not credible that TFO Burgos' made the exact statement to which Defendant testified.[5] Yet, even assuming *arguendo* that such a remark or similar statement was made by TFO Burgos', it would not have been enough to overbear Defendant's will to have rendered Defendant's statement to the DEA agents involuntary.

In the context of coercive law enforcement behavior, "[a] promise or threat need not be explicit, but can also result from '[s]ubtle psychological coercion.'" *Hufstetler*, 782 F.3d at 24. "However, the mere fact that a defendant is placed 'under some psychological pressure' by agents does not necessarily render a confession involuntary." *Jacques*, 744 F.3d at 811 (citing *United States v. Jobin*, 535 F.2d 154, 159 (1st Cir.1976)). "It is well settled in the First Circuit that an officer does not impermissibly overbear a defendant's will by promising to bring the defendant's cooperation to the prosecutor's attention or by suggesting that cooperation may lead to more favorable treatment." *Id*. at 810 (citing *United States v. Baldacchino*, 762 F.2d 170, 179 (1st Cir. 1985)). In contrast, even though "the rules governing an agent's threats of harsher punishment in exchange for a defendant's failure to cooperate is less settled, [the Court of Appeals for the First Circuit] has held that threats of retaliation are just one factor relevant to evaluating the voluntariness of a confession." *Id.* (citing *Jackson*, 608 F.3d 100, at 103 (1st Cir. 2010)).

"[D]iscussion of a family member, on its own, is not *per se* coercive." *Hufstetler*, 782 F.3d at 23–24. Nonetheless, "statements that a defendant's refusal to cooperate may lead to an

---

[5] Agent Jiménez testified before Defendant, and although she did not deny in her testimony that TFO Burgos' made any such statement, nor was she asked whether TFO Burgos made the aforementioned statement, the Government did not directly introduce any evidence to directly rebut Defendant's allegation regarding what TFO Burgos told him.

extended separation from his or her loved ones may contribute to a finding that the defendant's

confession was coerced." *Jacques*, 744 F.3d at 811. Two cases have been particularly salient on

this point. In *Lynumn v. Illinois*, 372 U.S. 528 (1963), the Supreme Court held that the defendant

had been coerced into giving a confession after the police told her that "state financial aid for her

infant children would be cut off, and her children taken from her, if she did not cooperate, among

other factors." *Id.* (citing *Lynumn*, 372 U.S. at 534) (internal quotations omitted). In *United

States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981) the Ninth Circuit Court of Appeals found

that a defendant's confession was involuntary because law enforcement made her "fear that, if

she failed to cooperate, she would not see her young child for a long time." *Id.* (citing *Tingle*,

658 F.2d at 1336). In distinguishing those cases, the Court of Appeals for the First Circuit has

noted that those decisions involved "mothers, [who] were coerced by threats that their children

would be taken from them unless the defendants cooperated with the police" and because there

was evidence "that the defendants in both cases may have been more susceptible to

psychological coercion than defendants more familiar with the criminal justice system." *United

States v. Jackson*, 918 F.2d 236, 242 (1st Cir. 1990); *see also Jacques*, 744 F.3d at 811. For

example, in *United States v. Jacques*, 744 F.3d at 811, the First Circuit Court of Appeals

distinguished *Lynumn* and *Tingle* and found that under the totality of the circumstances, the

defendant's will was not overborne when police "remarked on the failing health of Jacques's

elderly father, suggesting that continued resistance might deprive Jacques of crucial years with

his family." *Jacques*, 744 F.3d at 808, 811. In *United States v. Cosme*, 484 F. Supp. 2d 194 (D.

Mass. 2007) the court also found that law enforcement did not engage in sufficiently coercive

conduct toward a mother detained in connection to a bank robbery because "the agents did not

threaten to take the defendant's children from her but properly warned her that, if she was

involved in the robbery, she faced a prison sentence that could result in her being separated from her children." *United States v. Cosme*, 484 F. Supp. 2d 194, 200 (D. Mass. 2007); s*ee also United States v. Brewer*, 2009 WL 29655, at *12 (N.D. Iowa Jan. 5, 2009), *report and recommendation adopted*, 2009 WL 197995 (N.D. Iowa Jan. 24, 2009), *aff'd*, 624 F.3d 900 (8th Cir. 2010) ("there is no evidence . . . that the officers threatened to 'take the children away' or told [the defendant] that she would never see the children again.").

Any coercive effect of TFO Burgos' statements that Defendant faced 30 years in prison and would not see his children again, even assuming *arguendo* that such a statement was made at some point during the interview, was not enough to overbear the will of the Defendant even when combined with Defendant's fatigue and lack of experience with the U.S. justice system. Given that TFO Burgos' statement involved not being able to see Defendant's children, his statement may be construed as more coercive than if it had been made about not seeing an adult relative.[6] Particularly, the implication in *Brewer* is that telling Defendant that he would never see his children again could be unduly coercive. *Brewer*, 2009 WL 29655, at *12. Even so, when TFO Burgos' statement is read in its entirely, the gist of what he was communicating to Defendant was more like the statement in *Cosme*, where Police indicated that as a result of a lengthy prison sentence the defendant would not see her children again. *Cosme*, 484 F. Supp. 2d at 194. TFO Burgos' statement was not a threat that Defendant's children would be taken away from him or a threat to deny state financial benefits in supporting his children. Indeed, there is no evidence in the record which indicates that the United States Government has any direct control or authority over the aforementioned matters regarding Defendant's children, particularly if his

---

[6] While testimony was given that Defendant has children, no testimony was provided on their exact ages. *See* ECF No. 223 at 98.

children live in Venezuela—Defendant's country of national origin. Instead, as in *Cosme*, TFO Burgos' statement appealed primarily to Defendant's ability to see his children as a result of his potential prison sentence, and TFO Burgos made no reference to the wellbeing or care for Defendant's children—whether they be in the United States or elsewhere.

Additionally, TFO Burgos' statement that Defendant would receive 30 years in prison unless he talked, while perhaps misleading inaccurate, is not patently false. Defendant is charged with two violations of 46 U.S.C.A. § 70503(a) involving both conspiracy and possession with intent to distribute more than five kilograms or more of a mixture of substance containing a detectable amount of cocaine, each of which carries a possible sentence of imprisonment "of not less than 10 years and not more than life." 46 U.S.C.A. § 70506; 21 U.S.C.A. § 960(b)(1)(B).[7] TFO Burgo's 30-year forecast was not out of the realm of possibilities with regard to Defendant's potential prison sentence. Therefore, while TFO Burgos' statement would have undoubtedly exerted some psychological pressure upon Defendant, all told, TFO Burgos' statement did not rise to the level of coercive deception that would overbear Defendant's will.

Under the totality of the circumstances, any comments by TFO Burgos, in combination with Defendant's fatigue and inexperience with the American justice system, are not enough to outweigh the circumstances indicating Defendant's voluntary waiver. In particular, Defendant was an adult of 33 years, advised of his rights in his own language, not intentionally deprived of shelter, never deprived of food, water, or clothing, and not subjected to a lengthy interrogation to coerce a confession.

---

[7] The affidavit submitted in support of the criminal complaint details that "[t]he thirteen (13) bales recovered had an at-sea weight of 325 kilograms of cocaine", not an insignificant amount of controlled substances. ECF No. 1-1 at 4.

### B. Initial Court Appearances Delay

Finally, Defendant also argues for suppression on the basis that the Government improperly delayed Defendant's first appearance before the court. ECF No. 108 at 22. Specifically, Defendant argues that as soon as Defendant was transferred to a Coast Guard vessel on June 23, 2021, he should have had his initial appearance before a magistrate judge via videoconference. ECF Nos. 108 at 23–24; 228 at 16–17. Secondly, the Defendant argues that the agents intentionally delayed his initial court appearance one he was in San Juan solely for the improper purpose of questioning him. ECF No. 108 at 23; ECF No. 228 at 16–17.

Pursuant to Federal Rule of Criminal Procedure 5(a), "[a] person making an arrest outside the United States must take the defendant without unnecessary delay before a magistrate judge[.]" Fed. R. Crim. P. 5(a)(1)(B). The Supreme Court in *County of Riverside v. McLaughlin* has construed the Fourth Amendment as imposing a presumptive 48-hour time limit on detentions before a probable cause determination is made once a Defendant has been arrested. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991); *United States v. Encarnación*, 239 F.3d 395, 398 n. 2 (1st Cir. 2001) ("the 48–hour rule is a requirement of the Fourth Amendment, not Rule 5(a)").[8] Rule 5(a) was enacted to prevent federal law enforcement from using the time between an arrest and a defendant's first court appearance to procure a confession. *United States v. Vilches-Navarrete*, 413 F. Supp. 2d 60, 66–67 (D.P.R. 2006). Title 18, United States Code, Section 3501(c) provides:

> In any criminal prosecution by the United States . . ., a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States . . . if such confession is found

---

[8] In this case, the criminal complaint was authorized on June 27, 2021 at 1:41 PM, that is the day before he arrived in Puerto Rico. ECF No. 1.

by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

### 1.    Defendant's Initial Appearance Delay at Sea

The Supreme Court in *United States v. Verdugo-Urquidez*, 194 U.S. 259, 267 (1990) made "clear that the actions of the United States directed against aliens in foreign territory or in international waters are not constrained by the Fourth Amendment." *United States v. Bravo*, 489 F.3d 1, 9 (1st Cir. 2007) (citing *Verdugo-Urquidez*, 194 U.S. at 267); *United States v. Taborda-Reales*, 2021 WL 156553 at *2 (D.P.R. Apr. 20, 2021) ("the Fourth Amendment does not constrain the United States' actions against aliens in international waters."). In this case, the requirements of Rule 5(a) were not applicable to Defendant until he made port in San Juan.

Nevertheless, it is undisputed in this case that the Defendant was shackled and placed aboard two separate Coast Guard vessels after having been initially detained aboard a Dutch ship. Defendant was not free to leave nor allowed to reboard or travel in his own vessel, and indeed, that Mi Liny was sunk by the Coast Guard after Defendant had been held by the Coast Guard for four days. Even assuming that in this case that Defendant was in "custody" as soon as he was brought aboard and shackled on a U.S. Coast Guard vessel, any delay in his appearance before a magistrate judge in this case did not violate the strictures of Rule 5(a) or § 3501, as explained below.

In *United States v. Vilches-Navarrete*, this court held that the time spent transporting a group of defendants "from the high seas for further search in Puerto Rico (approximately 5 days) was not an unreasonable delay in bringing Defendant's before a magistrate." *Vilches-Navarrete,*

23

413 F. Supp. 2d 67. In that case, after having been boarded and detained aboard their own vessel by the Coast Guard, the court found that the Coast Guard "proceeded to Puerto Rico without delay" and there was "no evidence on the record that the Coast Guard purposely slowed their progress or took a longer route than necessary." *Id*. Furthermore, the court stated that "the Coast Guardsmen **could not** have brought defendants before a [m]agistrate while they were at sea" and assumed the 48-hour rule was only triggered once the defendants were moored at port "because the Coast Guardsmen **could not** have taken defendants before a magistrate until they arrived on *terra firma.*" *Id.* at 67–68, n. 8 (emphasis in original). Finally, the court noted that because the defendants were foreign nationals, the fact that they were held for two days in port did not present an unreasonable delay violation because "Government agents could not let them disembark in San Juan even if they wanted to, as they were not legal immigrants." *Id.* at 66, n. 6.

Several courts facing the dilemma of detentions at sea by the Coast Guard have also recognized the dual role of U.S. Coast Guard as both a law enforcement body and a guardian of national security, and that a Coast Guard vessel may attend to its duties as long as the delay produced is still reasonable. *See e.g. United States v. Purvis*, 768 U.S. 1237, 1239 (11th Cir. 1985) (finding no unreasonable delay even when "the Coast Guard cutter did not proceed directly to Key West, Florida, the nearest United States port, but rather continued its normal law enforcement patrolling activities. In addition, the vessel stopped for approximately eight hours to attempt to sink an abandoned vessel."); *Taborda-Reales*, 2021 WL 156553, at *2 (finding that a ten-day delay between the Coast Guard's apprehension of defendants near the Dominican Republic was not unreasonable when considered in the light of the facts and circumstances in that case after a pursuit took the Coast Guard vessel "several hundred miles south of the Dominican Republic," but cautioning that "that ten days may not always be reasonable.");

*United States v. Quijije Franco*, 2017 WL 11536137, at \*4 (S.D. Fla. Dec. 27, 2017) ("Coast Guard Cutters cannot be used as taxis to ferry detainees immediately to the nearest United States port. . . . The Government is not required to take the fastest possible route to the courthouse, just a reasonable one."). Defendant cites no contrary authority to the above precedents.

After being held for two days on the Dutch vessel upon which he was originally detained, Defendant's journey to San Juan, Puerto Rico took approximately six days after his transfer to two U.S. Coast Guard vessels. Defendant was at sea for five days aboard the first U.S. Coast Guard vessel from June 22 to June 27, 2021 and for a little under seventeen hours on the second vessel from 3:00 PM on June 27 until 7:45 AM on June 28, 2021. Although Defendant testified that he perceived that "[w]e were going back and forth, back and forth," neither this testimony nor any other evidence in the record demonstrates that the trip to San Juan was purposefully delayed or that six days was a longer time than would normally be required for Defendant to be transported by the Coast Guard to San Juan, Puerto Rico. ECF No. 223 at 73.[9] Even if the Coast Guard did delay for some unstated reason in the record, the Coast Guard vessels which transported Defendant were not required to abandon their normal law enforcement and national security duties merely to transport defendants to port for an initial appearance hearing  unless that delay became unreasonable. *See e.g. supra Purvis*, 768 U.S. at 1239. The record does not reflect that the Court Guard slowed their progress or took a longer route than necessary while traveling to San Juan. Therefore, no evidence in the record convincingly demonstrates that Defendant was subject to unreasonable delay while being transported to San Juan, Puerto Rico.

---

[9] In total, Defendant was detained at sea for roughly eight days, from June 20, 2021 to June 28, 2021. However, Defendant does not explicitly argue that the Dutch vessel upon which Defendant was held was somehow an agent of the United States government, and instead argues that all the detainees "were within US territory since at least Ju[ne] 23, 2021 when they were transferred onto the Coast Guard vessel." ECF No. 228 at 17. Regardless, no evidence in the record indicates that the additional two days aboard the Dutch vessel, even if the Dutch ship was acting as an agent of the U.S. Government, unreasonably prolonged or delayed Defendant's appearance before the court.

There is also no evidence in the record that the six-day trip at sea was being used as a means to extract a confession from Defendant because it is undisputed by the parties that Defendant was not interrogated or questioned while he was aboard any Coast Guard vessel beyond his biographical information. It was only once the Defendant came into the custody of the DEA that he was subject to any questioning, and the effect of that extended trip at sea is properly analyzed under voluntariness, which has already been addressed above. As such, nothing about Defendant's transportation during six days violated the requirements of Rule 5(a) that Defendant be brought before a magistrate judge without unnecessary delay. Furthermore, the travel required to transport the Defendant from near Isla de Aves, Venezuela, to San Juan, Puerto Rico is precisely the type "travel or transportation" difficulty which would justify delay beyond six hours since the intervention at sea.

Additionally, despite Defendant's assertion that "nowadays in the era of [Z]oom courtrooms, and remote and satellite internet access it should be improper to delay presentment", such a demand is not reasonable. First, Coast Guard vessels would be presented with the difficulty of attempting to determine in which district the detainees should be given their initial appearance virtually while they are still in international waters. Even if the Coast Guard was able to provide an initial appearance in a nearby jurisdiction, other exigencies, such as inclement weather, pursuit, or rendering emergency aid, may later require that the Coast Guard vessel place defendants ashore in a totally different district from that in which they were provided an initial appearance via videoconference. While the technology may indeed have been feasible in 2021, to require the Coast Guard to exercise the additional duty of establishing a satellite internet connection at sea and facilitate a virtual appearance of each defendant detained on the high seas amidst their other activities and responsibilities on the vessel would be unreasonable. As such,

the court declines to saddle the Coast Guard with the additional burden of transforming its vessels into seaborne virtual courtrooms. In sum, in this case, there is no evidence which indicates that Defendant's transportation by two different Coast Guard vessels for a total of six days between June 22nd and June 28, 2021 resulted in unreasonable delay of his initial appearance before a magistrate judge under either Rule 5(a) or § 3501.

### 2.  Defendant's Initial Court Appearance Delay in San Juan, Puerto Rico

Likewise, once in San Juan, the delay between his arrival at 7:45 AM and his initial appearance before a magistrate judge at 5:38 PM was not unreasonable. In *United States v. Beltran*, 761 F.2d 1, 8 (1st Cir. 1985), a total of thirteen defendants were held at sea for six days after being apprehended and were not brought before a magistrate judge for more than 20 hours after having come ashore. During that delay, the defendants underwent "processing" by immigration authorities as well as by the DEA and spent an additional night in a state prison before being brought before a magistrate judge. *Id*. In illustrating the delay, the court explained that the thirteen defendants were first processed by what was then known as the Immigration and Naturalization Service ("INS") for three hours, which averaged to 15 minutes per defendant. *Id.* Thereafter, the DEA processed each Defendant during a total of six hours, "or less than one-half hour per defendant." *Id*. The court noted that an additional hour delay was caused by the need to wait for a Spanish-language interpreter for the defendants. *Id.* The First Circuit Court of Appeals held that "given the situation of their six days under arrest at sea, we find that the exigencies of the law required the various law enforcement agencies to give top priority to bringing the crewmen before a magistrate at the first possible moment." *Id.* Accordingly, the First Circuit Court of Appeals held that the delay was unreasonable, but that because "no purposeful postponement of the arraignment and no lengthy, hostile or coercive interrogation [had]

prejudiced the appellants" the court concluded that "the delay should not warrant suppression of the statements." *Id.* The court noted that "[a] lapse of time between arrest and initial appearance, standing alone, does not require the exclusion of a statement made during this period." *Id.* (citing *United States v. Marrero,* 450 F.2d 373, 376 (2d Cir.1971) ("It is not the lapse of time, but the use of time, . . . to employ the condemned psychologically coercive or third degree practices [of interrogators, which is proscribed].").

Like *Beltran*, the delay in Defendant's initial appearance before the court does not merit suppression of Defendant's statements to the DEA agents. In this case, unlike in *Beltran*, Defendant was not held overnight in Puerto Rico, his delay was half the delay of the Defendants in *Beltran*, and he was not questioned for a lengthy period of time. As already mentioned above, during the roughly 10 hours between Defendant's arrival in San Juan and his initial appearance, he was only questioned by the DEA for less than an hour, of which only 20 minutes really consisted of interrogation regarding the offense for which he was charged. The Defendant, as previously discussed, while undoubtedly feeling some fatigue, was not subjected to such a coercive interrogation which rendered the statement he gave to the DEA agents involuntary.

Instead, the greatest reason for delay was the sheer number of defendants and the need for them to undergo processing before two agencies: CBP and the DEA. *See e.g. Vilches-Navarrete*, 413 F. Supp. 2d at 66, n. 6 ("[G]overnment agents could not let them disembark in San Juan even if they wanted to, as they were not legal immigrants."). Here, to speed up processing, law enforcement agents decided to split the 18 defendants in to two groups of nine, so that one group could be processed by CBP while another group could be processed by the DEA. Indeed, Agent Jiménez testified that the reason the defendants were split into two groups was at "the request of the CBP due to space and limitations." ECF No. 223 at 37. She also testified that CBP processing

could take anywhere between one and six hours, and processing a total of 18 detainees likely was of significant duration. ECF No. 223 at 24. Therefore, in the almost ten hours before Defendant was brought before a magistrate judge on June 28, 2021, he was taken from the port at La Puntilla, San Juan, Puerto Rico to the DEA location at the Hiram Bithorn Stadium for processing with eight other defendants, ate a meal, was transported to a CBP office for immigration processing with eight other individuals, the DEA prepared the required documents for the detainees' initial appearances, and then Defendant transported to where he finally appeared for his initial appearance via videoconference at 5:38 PM that same day.[10] It is credible that the processing, transport, and feeding of these 18 detainees took the full ten hours at issue in this case, and the Government succeeds in demonstrating that such delay was reasonable and necessary. Defendant was not subject to any lengthy, hostile, or coercive interrogation and because of the logistical challenges required to transport and process 18 foreign nationals by immigration authorities and the DEA, the court finds that the approximate 10-hour duration between Defendant's arrival in San Juan and his initial appearance was not unreasonable and does not warrant suppression of his statements.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion to suppress (ECF No. 108) should be DENIED. The parties have fourteen (14) days to file any objections to this report and recommendation unless otherwise ordered by the court. Failure to file the same within the specified time waives the right to object to this report and recommendation. Fed. R. Civ. P.

---

[10] It is also standard practice in the District of Puerto Rico that before an initial appearance takes place, the arrestees are interviewed by the Assistant Federal Public Defender ("AFPD") on duty (for purposes of assisting them at the initial appearance hearing) and also by the Pretrial Services Division of the U.S. Probation Office. Although it is unclear whether in this case the Defendant declined to be interviewed by either the AFPD on duty or the U.S. Pretrial Services Officer, this could very well have accounted for some of the delay to have the Defendant make his first appearance in court.

72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); D.P.R. Civ. R. 72(d); *see also* 28 U.S.C. § 636(b)(1); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir. 1994); *United States v. Valencia*, 792 F.2d 4 (1st Cir. 1986).

IT IS SO RECOMMENDED.

In San Juan, Puerto Rico, this 10th day of August, 2022.

s/Marcos E. López
U.S. Magistrate Judge